# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

_____

N⁰ 07-CV-5244 (JFB) (ETB)

_____

INCORPORATED VILLAGE OF GARDEN CITY,

Plaintiff,

VERSUS

GENESCO, INC. AND GORDON-ATLANTIC CORP.,

Defendants.

_____

**MEMORANDUM AND ORDER**
January 27, 2009

_____

JOSEPH F. BIANCO, District Judge:

Plaintiff, the Incorporated Village of Garden City ("plaintiff" or "the Village") brought this action on December 14, 2007 against Genesco, Inc. ("Genesco") and Gordon-Atlantic Corp. ("Gordon-Atlantic"), alleging that defendants bear responsibility for toxins released into the Village's water supply. Plaintiff asserts claims under the following federal laws: (1) the Resource Conservation and Recovery Act, 42 U.S.C. §§ 6901 *et seq.* ("RCRA"); (2) the Safe Drinking Water Act, 42 U.S.C. §§ 300f *et seq.* ("SDWA"); and (3) the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. §§ 9601 *et seq.* ("CERCLA"). Plaintiff further asserts the following pendent claims under New York State common law: (1) private nuisance; (2) public nuisance; (3) trespass; (4) negligence; (5)

indemnification; and (6) negligence *per se*. Jurisdiction over plaintiff's state law claims is appropriate pursuant to 28 U.S.C. §§ 1367(a) and 1391(b). Plaintiff seeks injunctive relief under RCRA, SDWA and its state common law claims of private and public nuisance, trespass and negligence, cost recovery under SDWA and CERCLA, and damages under all state law claims.

Defendants now move to dismiss the complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. For the reasons that follow, defendants' motion is granted in part and denied in part.

## I. BACKGROUND

### A. The Facts

The following facts are taken from the complaint ("Compl.") and are not findings of fact by the Court, but rather are assumed to be true for purposes of deciding this motion and are construed in a light most favorable to plaintiff, the non-moving party.

The Village, a municipal corporation organized under the laws of the State of New York, delivers drinking, or "potable" water to an estimated 21,650 residents of Long Island from an aquifer which draws water from underground public supply wells. (Compl. ¶¶ 4, 9, 10.) Between approximately 1965 and 1969, a former subsidiary of Genesco operated a fabric cutting mill at 150 Fulton Avenue in Garden City Park, New York ("the Site"), a 0.8 acre parcel of land located directly upgradient of three of the public supply wells. (*Id*. at ¶¶ 5, 12.) The operations of the mill included a dry cleaning machine utilized to clean fabrics, which used significant amounts of tetrachloroethylene ("PCE"), a volatile organic compound ("VOC") which is a toxic substance, hazardous waste and suspected carcinogen. (*Id*. at ¶¶ 2, 13.) The operations used an underground Class V injection well, as defined by 40 C.F.R. § 146.5(e), to inject wastes into the subsurface formation which included PCE. (*Id*. at ¶¶ 14, 15.) When Genesco's lease expired, it did not properly close the Site's injection well so as to prevent further contaminants from entering the well and into the underground source of Village drinking water. (*Id*. at ¶¶ 16-17.) Gordon-Atlantic, the current owner of the Site, has also failed to close the well. (*Id*. at ¶ 18.) Accordingly, PCE did then and continues to flow from the Site into the underground sources of drinking water at levels that violate the New York State Department of Health ("NYSDOH") primary drinking water standards and the New York State Department of Environmental Conservation ("NYSDEC") groundwater quality standards. (*Id*. at ¶ 19.)

Between 1986 and 1996, the Nassau County Department of Health ("NCDOH") and the Nassau County Department of Public Works ("NCDPW"), along with the NYSDEC, investigated the area within and around the Site to determine the source of VOC impact to a number of area supply wells; these investigations concluded that the Site was a source of VOC contamination of the aquifer from which the Village draws its drinking water. (*Id*. at ¶¶ 23-25.) Since 1996, such investigations have been overseen primarily by the NYSDEC and the United States Environmental Protection Agency ("EPA"). (*Id*. at ¶ 23.) In connection with the initial investigation, Genesco retained an environmental consulting firm which conducted further investigation into the PCE contamination; as a part of that inquiry, the NYSDEC, the NYSDOH and Genesco documented that Genesco released a substantial amount of PCE into the environment from the dry cleaning machine and associated injection well at the Site. (*Id*. at ¶¶ 26-27.) Genesco has further submitted reports to the NYSDEC demonstrating that, as a result of the use and disposal of PCE on the Site, the soil, soil vapors, groundwater and sediments at the Site have been heavily contaminated by PCE, which has impacted the supply wells. (*Id*. at ¶¶ 28-29.)

In May of 1993, the NYSDEC placed the Site on the Registry of Inactive Hazardous Waste Disposal Sites in New York State and designated it as a "Class 2" site, meaning that hazardous wastes disposed of therein present a significant threat to public health or the

environment, warranting action. (*Id.* at ¶¶ 30-31.) The NYSDEC identified Genesco as a Potentially Responsible Party ("PRP") under CERCLA and entered into an Administrative Order on Consent ("Consent Order") with Genesco that required it to perform a Remedial Investigation and Feasibility Study ("RI/FS") and permitted it to design and implement an Interim Remedial Measure ("IRM") if necessary. (*Id.* at ¶¶ 32-33.) Genesco has not admitted liability nor committed to any permanent remedial measures. (*Id.*)

On April 1, 1998, the EPA placed the Site on the National Priority List ("NPL") under CERCLA. (*Id.* at ¶ 34.) Between August 1998 and December 2001, Genesco conducted an IRM to remove contaminants from the injection well and installed a soil-vapor extraction system to address residual soil contamination. (*Id.* at ¶ 35.) In November of 2005, the NYSDEC and EPA approved Genesco's RI/FS. (*Id.* at ¶ 36.) In or about 2007, the EPA assumed management responsibility for the Site investigation and remediation from the NYSDEC and announced a proposed interim remedial plan ("Interim Plan") in February of 2007 that called for the installation of a groundwater extraction and treatment system, the application of chemical oxidation technology, and improving the wellhead treatment for Supply Well Nos. 13 and 14, with an estimated total cost of approximately $10,700,000. (*Id.* at ¶¶ 37-39.)

Because NYSDOH and NYSDEC regulations prohibit PCE concentration in groundwater at levels exceeding five parts per billion ("ppb") and the Village's Supply Well water concentration levels exceed that figure, the Village has installed, at its own expense, treatment systems to ensure that PCE is removed from the drinking water and that the water meets federal and state drinking water standards. (*Id.* at ¶¶ 42-48.) To date, no governmental entity has commenced any administrative or judicial enforcement proceeding or action compelling defendants to properly close the injection wells or remove, remediate or control ongoing PCE contamination at the Site, which allegedly continues to threaten the environment as well as the public health. (*Id.* at ¶¶ 54-56.) According to the complaint, absent remediation, the PCE contamination will migrate to additional public potable water supplies unequipped to treat it until the contamination can no longer be effectively treated. (*Id.* at ¶¶ 57-61.)

In order to address the PCE contamination at the Site, the Village has hired professionals to assess the contamination, installed a water treatment system and upgraded the technology therein, at a cost in excess of $2,500,000. (*Id.* at ¶ 62.) The Village estimates that the present day value of past and potential future costs could exceed $41,000,000. (*Id.* at ¶ 63.) Neither defendant has agreed to reimburse the Village for costs incurred or assume responsibility for effectuating a permanent solution to the contamination. (*Id.*)

By letter dated December 18, 2006, the Village placed defendants on notice that it intended to sue them as past or present owners or operators of the Site under 42 U.S.C. § 6972(b), as well as pursuant to the SDWA's citizen suit provision for causing an underground injection of contaminants and failing to properly close the injection well. (*Id.* at ¶¶ 64-65.) On or about November 15, 2006, the Village and Genesco executed a tolling agreement, which has since been extended, by which the parties agreed that for purposes of any applicable statute of limitations, the action was commenced on

November 27, 2006[1] and any statutorily required waiting period after citizen suit notice was served was satisfied prior to the commencement of that action. (*Id.* at ¶ 66.)

In September of 2007, the EPA issued a Record of Decision ("ROD") which selected an interim remedy for part of the site designated as Operable Unit 1. (*Id.* at ¶ 68.) The interim remedy involves the partial remediation of the groundwater utilizing an extraction and treatment system in conjunction with the application of a chemical oxidation in the vicinity of the original PCE source area, as well as an evaluation of the well-head treatment system installed by the Village at the supply wells. (*Id.*) The ROD estimated that costs over a thirty-year period will total approximately $10,700,000. (*Id.*)

## B. Procedural History

Plaintiff filed its complaint on December 14, 2007. On April 23, 2008, defendants moved separately to dismiss the complaint. Plaintiff responded on June 23, 2008. Defendant Genesco submitted its reply on July 9, 2008. Defendant Gordon-Atlantic submitted a letter to the Court on August 8, 2008, in lieu of a reply brief, supporting the arguments contained in Genesco's reply. Oral argument was held on September 8, 2008. This matter is fully submitted.

## II. STANDARD OF REVIEW

In reviewing a motion to dismiss under Rule 12(b)(6), a court must accept the factual allegations set forth in the complaint as true, and draw all reasonable inferences in favor of the plaintiff. *See Cleveland v. Caplaw Enters.*, 448 F.3d 518, 521 (2d Cir. 2006); *Nechis v. Oxford Health Plans, Inc.*, 421 F.3d 96, 100 (2d Cir. 2005). The plaintiff must satisfy "a flexible 'plausibility' standard, which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim *plausible*." *Iqbal v. Hasty*, 490 F.3d 143, 157-58 (2d Cir. 2007). "[O]nce a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1969 (2007). The Court does not, therefore, require "heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face." *Id.* at 1974.

## III. DISCUSSION

## A. The RCRA Claim

"The RCRA is a comprehensive environmental statute that governs the treatment, storage, and disposal of solid and hazardous waste." *Meghrig v. KFC Western, Inc.*, 516 U.S. 479, 483 (1996) (citing *Chicago v. Envtl. Defense Fund*, 511 U.S. 328, 331-32 (1994)). "Its purpose is to minimize the present and future threat to human health and the environment, not effectuate the clean-up of toxic waste sites or allocate those costs." *Lambrinos v. Exxon Mobil Corp.*, No. 1:00 Civ. 1734, 2004 WL 2202760, at *3 (N.D.N.Y. Sept. 29. 2004) (internal citations omitted); *see also Meghrig*, 516 U.S. at 483. Accordingly, the RCRA has a "citizen suit" provision, allowing claimants to obtain a "mandatory injunction, *i.e.*, one that orders a responsible

---

[1] Genesco does not contest the November 27, 2006 date for purposes of the instant motion, but maintains that the suit should be deemed filed on December 2, 2006. (Genesco's Memorandum of Law, at 10 n.4.)

party to 'take action' by attending to the cleanup and proper disposal of toxic waste, or a prohibitory injunction, *i.e.*, one that 'restrains' a responsible party from further violating RCRA." *Meghrig*, 516 U.S. at 484.

Plaintiff argues that because defendants disposed of PCE, a hazardous waste, at the Site and failed to remediate the effects of that action, it is entitled to injunctive relief from this Court ordering that defendants investigate and remediate the discharge of PCE into the groundwater underneath the Site in order to eliminate the danger to the environment and the public health. Plaintiff further contends that defendants should bear the past and future costs and expenses borne by the Village associated with the treatment of that discharge.[2]

The relevant statute states, in part, that:

> any person may commence a civil action on his own behalf
>
> . . .
>
> (1)(B) against any person, . . . including any past or present generator, past or present transporter, or past or present owner or operator of a treatment, storage, or disposal facility, who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or

hazardous waste which may present an imminent and substantial endangerment to health or the environment.

42 U.S.C. § 6972(a)(1)(B).[3] However, "[t]o ensure that citizen suits are not duplicative or disruptive of federal or state remediation efforts, [RCRA] § 7002(b)(2)(B) bars citizen suits in certain instances where the U.S. or a State has acted to address the alleged endangerment." *R.E. Goodson Constr. Co. v. Int'l Paper Co.*, No. 4:02 Civ. 4184, 2005 U.S. Dist. LEXIS 42909, at *87 (D.S.C. Oct. 13, 2005). Defendants thus argue that plaintiff's RCRA claim is barred by subsections (b)(2)(B)(i), (iii) and (iv) and subsections (b)(2)(C)(i) and (iii) of the statute. The Court considers each argument in turn.

### 1. Subsections (b)(2)(B)(i) and (b)(2)(C)(i)

The RCRA provision under which plaintiff brings its claim states that:

> [n]o action may be commenced under subsection (a)(1)(B) of this section if the Administrator, in order to restrain or abate acts or conditions which may have contributed or are contributing to the activities which may present the alleged endangerment –

---

[2] The Court notes that such damages are not appropriate in a RCRA claim, *see Meghrig*, 516 U.S. at 484; *Commerce Holding Co. Inc. v. Buckstone*, 749 F. Supp. 441, 445 (E.D.N.Y.1990), but their improper inclusion is not fatal to the claim as it relates to injunctive relief.

[3] There is no dispute that, for the purposes of the instant motion, defendants are "persons" as defined by 42 U.S.C. § 6903(15), PCE is both a "hazardous waste" and a "solid waste" as defined by 42 U.S.C. §§ 6903(5) and (27), and defendants "disposed" of PCE at the Site as defined by 24 U.S.C. § 6903(3).

(i) has commenced and is diligently prosecuting an action under section 6973 of this title or under section 106 of the Comprehensive Environmental Response, Compensation and Liability Action of 1980 [42 U.S.C. § 9606]

42 U.S.C. § 6972(b)(2)(B)(i). Subsection (b)(2)(C)(i) bars a citizen suit in the event that the *state* is "diligently prosecuting" an action under "subsection (a)(1)(B)." 42 U.S.C. § 6972(b)(2)(C)(i). Accordingly, defendants argue that plaintiff's RCRA claim is barred by the EPA and the NYSDEC's respective "diligent prosecution" of the action, *i.e.,* the EPA's 2005 approval of Genesco's remedial investigation and the agency's subsequent issuance of a preliminary plan and accompanying Administrative Order, and the NYSDEC's Consent Order requiring Genesco to perform an RI/FS and IRM. Plaintiffs respond that "prosecution" as termed in subsection (b)(2)(B)(i) necessarily means an action brought in district court, as set forth in 42 U.S.C. § 6973 and 42 U.S.C. § 9606.[4] Plaintiff argues that

(b)(2)(C)(i) also requires a court action. As neither the EPA nor the NYSDEC has brought suit against either defendant in federal or state court, respectively, plaintiff submits, neither agency is "diligently prosecuting" an action such that it would bar plaintiff's RCRA citizen suit.

storage, or disposal facility) who has contributed or who is contributing to such handling, storage, treatment, transportation or disposal to restrain such person from such handling, storage, treatment, transportation, or disposal, to order such person to take such other action as may be necessary, or both.

42 U.S.C. § 6973 (emphasis added). Section 106 of CERCLA states that

In addition to any other action taken by a State or local government, when the President determines that there may be an imminent and substantial endangerment to the public health or welfare or the environment because of an actual or threatened release of a hazardous substance from a facility, he may require the Attorney General of the United States to secure such relief as may be necessary to abate such danger or threat, and *the district court of the United States in the district in which the threat occurs shall have jurisdiction to grant such relief* as the public interest and the equities of the case may require.

42 U.S.C. § 9606(a) (emphasis added).

---

[4] Section 6973 of the title states that

. . . upon receipt of evidence that the past or present handling, storage, treatment, transportation or disposal of any solid waste or hazardous waste may present an imminent and substantial endangerment to health or the environment, the Administrator may bring suit on behalf of the United States *in the appropriate district court* against any person (including any past or present generator, past or present transporter, or past or present owner or operator of a treatment,

Defendant Genesco argues in its reply memorandum that "diligent prosecution" in the relevant subsections cannot require formal court proceedings because subsection (b)(1)(B) bars a citizen suit "if the Administrator or State has commenced and is diligently prosecuting a civil or criminal action in a court of the United States or a State," and if Congress had intended for subsection (b)(2)(B)(i) and (b)(2)(C)(i) to require the same, it surely would have included similar language in those subsections. (Genesco's Reply Memorandum of Law, at 2 n.1.) The Court finds this argument unavailing, noting first that subsection (b)(1)(B) lists bars to actions brought under subsection (a)(1)(A), while the relevant subsection here refers to actions brought under subsection (a)(1)(B). Further, regarding section (b)(2)(B)(i), the term "diligent prosecution" does not stand alone, but rather refers to actions defined in other sections of the United States Code, both of which specify that the action be one brought "in the appropriate district court." *See* 42 U.S.C. §§ 6973, 9606(a). Finally, the term "action" is qualified in both subsections (b)(2)(B)(i) and (b)(2)(C)(i) with the phrase "no action may be brought *under subsection (a)(1)(B)*" (emphasis added). That subsection states in turn that "any action under paragraph (a)(1) of this subsection shall be brought in the district court for the district in which the alleged violation occurred or the alleged endangerment may occur." 42 U.S.C. § 6972(a); *see Orange Env't, Inc. v. County of Orange*, 860 F. Supp. 1003, 1024-25 (S.D.N.Y. 1994) ("Had Congress intended for state administrative actions to preclude (a)(1)(B) citizen suits, it would have simply stated that such citizen suits cannot be commenced where the state has 'commenced and is diligently prosecuting an action.' Instead Congress required that the state be diligently prosecuting an action *under subsection (a)(1)(B)*. The use of such language can only be interpreted as incorporating the limitations on §

6972 (a)(1)(B) actions into the preclusion provisions.") (emphasis in original).

Lending further weight to this conclusion, many federal courts confronting this very issue have determined that administrative action alone, in the absence of an accompanying court action, does not constitute "diligent prosecution." *See PMC, Inc. v. Sherwin-Williams Co.*, 151 F.3d 610, 618-19 (7th Cir. 1998) (ruling that state administrative actions "were not 'actions' in the legal sense in which [§ 6972(b)(2)] appears to be using the term, that is, formal proceedings whether in a court or before an agency."); *Proffitt v. Comm'r, Township of Bristol*, 754 F.2d 504 (3d Cir. 1985) (EPA's issuance of Compliance Order did not constitute court action within meaning of § 6972(b)(2)); *Kara Holding Corp. v. Getty Petroleum Mktg., Inc.*, 67 F. Supp. 2d 302 (S.D.N.Y. 1999) (NYSDEC administrative action was not diligent prosecution of an action for purposes of § 6972(b)(2)); *Gilroy Canning Co. v. Cal. Canners & Growers*, 15 F. Supp. 2d 943, 946-47 (N.D. Cal. 1998) (state administrative actions did not preclude RCRA claims under terms of section 6972(b)(2)); *Echternach v. D.H. Martin Petroleum Co.*, No. 97 Civ. 3802, 1997 U.S. Dist. LEXIS 15677, at *8 (N.D. Ill. Sept. 30, 1997) ("Subsection (b)(2)(C)(i) only bars (a)(1)(B) claims where a state has brought an action in court."); *Goe Eng'g Co. v. Physicians Formula Cosmetics, Inc.*, No. 94 Civ. 3576, 1997 U.S. Dist. LEXIS 23627, at *26 (C.D. Cal. June 4, 1997) ("While Congress could have stated its intent more clearly, this Court holds that subsection (b)(2)(C)(i) only prohibits (a)(1)(B) claims where a state has brought an action in court."); *Orange Env't, Inc.*, 860 F. Supp. at 1024-25 (same).

In sum, plaintiff's RCRA claim is not barred by subsection(b)(2)(B)(i) or (b)(2)(C)(i) of the RCRA because neither the EPA nor the NYSDEC has brought suit in connection with the Site.

## 2. Subsections (b)(2)(B)(iii) and (b)(2)(C)(iii)

The RCRA also bars a citizen suit if the Administrator or the State "has incurred costs to initiate a Remedial Investigation and Feasibility Study under Section 104 of [CERCLA, 42 U.S.C. § 9604] and is diligently proceeding with a remedial action under that Act." 42 U.S.C. §§ 6972(b)(2)(B)(iii), (C)(iii).

Defendants assert that because the EPA and the NYSDEC have incurred costs to initiate an RI/FS under CERCLA section 104 and are diligently proceeding with a remedial action under that Act, plaintiff's RCRA claim is barred. Plaintiff responds that in order for an RI/FS to be initiated under section 104 of CERCLA, it must be initiated pursuant to a federal-state agreement and the RI/FS in this case was initiated pursuant to the 1997 Consent Order between the NYSDEC and Genesco without involvement from the EPA, who did not exercise responsibility with regard to the site until 2007.

Section 104 of CERCLA states, in relevant part:

> [w]henever (A) any hazardous substance is released or there is a substantial threat of such a release into the environment, or (B) there is a release or substantial threat of release into the environment of any pollutant or contaminant which may present an imminent and substantial danger to the public

> health or welfare, the President is authorized to act . . . to remove or arrange for the removal of, and provide for remedial action relating to such hazardous substance . . . . No [RI/FS] shall be authorized except on a determination by the President that the party is qualified to conduct the RI/FS and only if the President contracts with or arranges for a qualified person to assist the President in overseeing and reviewing the conduct of such RI/FS.

> . . .

> A State or political subdivision thereof or Indian tribe may apply to the President to carry out actions authorized in this section. If the President determines that the State or political subdivision or Indian tribe has the capability to carry out any or all of such actions in accordance with the criteria and priorities established pursuant to section 9605(a)(8) of this title and to carry out related enforcement actions, the President may enter into a contract or cooperative agreement with the State or political subdivision or Indian tribe to carry out such actions.

42 U.S.C. §§ 9604(a)(1), (d)(1). Accordingly, "[s]ection 104 is invoked when

states are authorized to act pursuant to a contract or cooperative agreement with the federal government." *Solvent Chem. Co. ICC Industries, Inc. v. E.I. Dupont De Nemours & Co.*, 242 F. Supp. 2d 196, 219 (W.D.N.Y. 2002) (ruling that subsection (b)(2)(C)(iii) did not bar plaintiff's RCRA claim because the State did not incur clean-up costs initiating an RI/FS pursuant to an agreement with the federal agreement, as the federal government had appeared in the action as a defendant rather than a "protector of the environment"); *Orange Env't, Inc.*, 860 F. Supp. at 1025-26; *see also Abundiz v. Explorer Pipeline Co.*, No. 3:00 Civ. 2029, 2002 U.S. Dist. LEXIS 7053, at *11 (N.D. Tex. Apr. 19, 2002) (RI/FS initiated under section 104 of CERCLA must be done so pursuant to federal-state agreement); *Interfaith Cmty. Org., et al. v. AlliedSignal, Inc.*, 928 F. Supp. 1339, 1348 (D.N.J. 1996) ("For a State action to be conducted pursuant to Section 104 of CERCLA, there must be an agreement between the State and the Federal government pertaining specifically to the action and to the site.").

Defendants argue that the RI/FS undertaken by Genesco in 1997 pursuant to an Administrative Order on Consent issued by the NYSDEC bars the RCRA claim because that agency acted pursuant to an agreement with the federal government. Specifically, defendants direct the Court's attention to letters exchanged between representatives from the NYSDEC and the EPA on October 3, 1997 and October 31, 1997, respectively, discussing the NYSDEC's Administrative Order on Consent, whereby the EPA states: "we concur with your proposal." (*See* Genesco's Reply Memorandum of Law, Ex. 1.)[5] Defendants further note in support of

their argument that the Administrative Order on Consent includes the following language: "The RI/FS Work Plan shall incorporate all elements of a RI/FS as set forth in [CERCLA] . . . ." (Alexis Decl., Ex. 2, at 4.)

Though Section 104 of CERCLA is clear in requiring that a state act pursuant to a "contract or cooperative agreement" with the federal government, there is no requirement

---

it or incorporated in it by reference, (2) documents 'integral' to the complaint and relied upon in it, even if not attached or incorporated by reference, (3) documents or information contained in defendant's motion papers if plaintiff has knowledge or possession of the material and relied on it in framing the complaint, (4) public disclosure documents required by law to be, and that have been, filed with the Securities and Exchange Commission, and (5) facts of which judicial notice may properly be taken under Rule 201 of the Federal Rules of Evidence." *In re Merrill Lynch & Co.*, 273 F. Supp. 2d 351, 356-57 (S.D.N.Y. 2003) (internal citations omitted), *aff'd in part and vacated in part on other grounds sub nom. Dabit v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 395 F.3d 25 (2d Cir. 2005), *vacated on other grounds*, 547 U.S. 71 (2006); *see also Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991) ("[T]he district court . . . could have viewed [the documents] on the motion to dismiss because there was undisputed notice to plaintiffs of their contents and they were integral to plaintiffs' claim"); *Brodeur v. City of New York*, No. 04 Civ. 1859, 2005 U.S. Dist. LEXIS 10865, at *9-*10 (E.D.N.Y. 2005) (court could consider documents within the public domain on a Rule 12(b)(6) motion to dismiss). As the documents allegedly constituting an agreement between the federal and state governments regarding abatement activities at the Site are "integral" to plaintiff's RCRA claim on its face, the Court may consider them in the instant motion. In fact, plaintiff has not objected to consideration of these documents.

---

[5] The Court notes that in adjudicating a Rule 12(b)(6) motion, it is entitled to consider: "(1) facts alleged in the complaint and documents attached to

that the agreement take one specific form; indeed, the fact that the parties may enter into a "contract" *or* a "cooperative agreement" suggests that the arrangement between the Agency and the state may be memorialized in a formal contract or take a less rigid format. Therefore, this exchange of letters between the parties regarding the specifics of the RI/FS to be conducted at the Site constitutes a "cooperative agreement" for the purposes of CERCLA 104. Plaintiff's argument that no such agreement existed because the EPA did not take over as the lead agency until 2007 is unavailing, as the language of the statute does not require that the federal government act in that capacity; rather, it only necessitates that the Agency enter into an agreement with the State authorizing it to conduct the RI/FS.

The Court's interpretation is consistent with not only the plain language of Section 104 of CERCLA, but also with the purpose of the RCRA provisions which bar citizen suits, as "[t]he purpose of RCRA § 7002 is to complement and not conflict or compete with the US and states' roles in investigating hazardous waste sites." *R.E. Goodson Constr. Co.*, 2005 U.S. Dist. LEXIS 42909, at *88; *see also Acme Printing Ink Co. v. Menard, Inc.*, 812 F. Supp. 1498, 1506-09 (E.D. Wis. 1992); *McGregor v. Indus. Excess Landfill, Inc.*, 709 F. Supp. 1401, 1407-08 (N.D. Ohio 1987) ("Only when the federal and state governments fail to act to remedy the situation or file suit in either State or federal courts due to inadequate public resources did Congress envision the need for private citizens to commence actions to correct environmental hazards."). As Gordon-Atlantic has noted in its memorandum of law, the NYSDEC and EPA have taken numerous steps to address contamination at the Site, including conducting a preliminary site assessment, placing the Site on the State Registry of Inactive Hazardous Waste Disposal Sites, conducting an

initial RI, engaging in cooperative sampling, placing the Site on the federal NPL, performing a focused FS with IRMs, overseeing the IRMs, ordering that Genesco perform an RI/FS, preparing a PRAP, preparing a ROD, and issuing an Administrative Order directing future activities on the Site. (*See* Gordon-Atlantic's Memorandum of Law, at 13.) The facts, as pled by plaintiff, confirm that both the state and the federal government are currently taking an active and cooperative role in investigating this hazardous waste site. Accordingly, plaintiff's RCRA citizen suit is inappropriate in the face of such active involvement. Because New York State "has incurred costs to initiate a Remedial Investigation and Feasibility Study under Section 104 of [CERCLA, 42 U.S.C. § 9604] and is diligently proceeding with a remedial action under that Act," plaintiff's action for injunctive relief under the RCRA cannot go forward and is hereby dismissed as against both defendants under subsections (b)(2)(B)(iii) and (b)(2)(C)(iii) of the RCRA.[6]

---

[6] Defendants also argue that plaintiff's RCRA claim is barred by subsection (b)(2)(B)(iv) because the EPA has issued an administrative order under section 106 of CERCLA, pursuant to which Genesco is conducting an RI/FS. Plaintiff argues (among other things) that, in the face of such an Order, the subsection only prohibits citizen suits as to "the scope and duration" of that Order and plaintiff contends that the relief it seeks exceeds the scope and duration of the Administrative Order. However, this Court need not address this issue because it has concluded that the RCRA claim is barred by subsections (b)(2)(B)(iii) and (b)(2)(C)(iii).

## B. The SDWA Claim

Plaintiff next asserts that defendants violated regulations promulgated pursuant to the SDWA, 42 U.S.C. §§ 300f *et seq.*, when they failed to prevent the movement of fluid containing PCE into the aquifer on the Site. Defendants argue that plaintiff's SDWA claim fails as a matter of law because the regulations upon which the claim is based did not exist at the time of the alleged release of the contaminants and have no retroactive effect. As set forth below, the Court agrees and dismisses the SDWA claim.

The first of the relevant regulations states that

> [n]o owner or operator shall construct, operate, maintain, convert, plug, abandon, or conduct any other injection activity in a manner that allows the movement of fluid containing any contaminant into underground sources of drinking water, if the presence of that contaminant may cause a violation of any primary drinking water regulation under 40 C.F.R. part 142 or may otherwise adversely affect the health of persons.

40 C.F.R. § 144.12(a).[7] Further,

> [p]rior to abandoning a Class V well, the owner or operator shall close the well in a manner that prevents the movement of fluid

containing any contaminant into an underground source of drinking water, if the presence of that contaminant may cause a violation of any primary drinking water regulation under 40 CFR part 141 or may otherwise adversely affect the health of persons.

40 C.F.R. § 146.10(c).[8]

The EPA issued 40 C.F.R. § 144.12(a) on April 1, 1983, *see* SDWA Underground Injection Control, 48 Fed. Reg. 14,146 (Apr. 1, 1983), and 40 C.F.R. § 146.10(c) on December 7, 1999, *see* Revisions to the Underground Injection Control Regulations for Class V Injection Wells, 64 Fed. Reg. 68,546 (Dec. 7, 1999). Defendants argue, and plaintiff does not contest, that the regulations at issue were not intended to have any retroactive effect. (*See* Genesco's Memorandum of Law, at 19 n.12; Gordon-Atlantic's Memorandum of Law, at 22.) The United States Supreme Court has determined that "administrative rules will not be construed to have a retroactive effect unless their language requires this result." *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988). Moreover, the Second Circuit has noted that it is "prohibited from applying a regulation to conduct that took place before its enactment in the absence of clear congressional intent where the regulation would 'impose new duties with respect to

---

[7] For purposes of the instant motion, the parties do not dispute that PCE is a "contaminant" within the meaning of 42 U.S.C. § 300f-6.

[8] For purposes of the instant motion, the parties do not dispute that the Site contains and/or contained one or more Class V wells under 40 C.F.R. § 146.5(e), which includes dry wells used for the injection of wastes into a subsurface formation.

transactions already completed.'" *Rock of Ages Corp. v. Sec'y of Labor*, 170 F.3d 148, 158 (2d Cir. 1999) (quoting *Landgraf v. USI Film Prods.*, 511 U.S. 244, 280 (1994)). Based on the plain language of the regulations at issue, the Court concludes that they were not intended to apply retroactively and, therefore, will not construe them as such.

Plaintiff alleges in its complaint that Genesco's lease, ownership and/or operation of the Site concluded in 1975 (Compl. ¶ 5), and that Gordon-Atlantic is the current owner of the Site. (*Id.* at ¶ 6.) As plaintiff has pled that Genesco's involvement with the Site ended in 1975, before either regulation was enacted, any claims brought against Genesco under either regulation cannot go forward, as Genesco's alleged injection activity and alleged failure to properly close the well when abandoning it both occurred prior to the enactment of the regulations. Accordingly, because any alleged conduct by Genesco necessarily preceded the issuance of the regulations, Genesco's motion to dismiss plaintiff's SDWA claim is granted.

With regard to Gordon-Atlantic, plaintiff has pled that it maintains current *ownership* over the Site and that it has not properly closed the Site's injection well in a manner that would prevent the injection of contaminants into the well or prevented the movement of fluid containing contaminants into an underground source of drinking water. (*Id.* at ¶¶ 6, 18.) However, there is no allegation in the complaint that Gordon-Atlantic maintained any *injection activity* after taking ownership of the Site or failed to properly close the well *after abandoning it*; indeed, it is clear from the complaint that it was Genesco who allegedly maintained the injection activity at the Site and abandoned the well without properly closing it before doing so. In other words, it was Genesco, not Gordon-Atlantic, who allegedly abandoned the well without properly closing it. Specifically, the complaint alleges that "[a]t the cessation of their operations and at the end of their lease Genesco did not properly close the Site's injection well in a manner that prevented the movement of fluid containing any contaminant into an underground source of drinking water." (*Id.* at ¶ 17.) Therefore, even though Gordon-Atlantic's ownership of the site post-dates the enactment of 40 C.F.R. §§ 144.12(a) and 146.10(c), because the strictures of those provisions apply only to owners or operators who are involved in "injection activity" under Section 144.12(a) or "abandon a Class V well" without first properly closing it under Section 146.10(c), and Gordon-Atlantic is not alleged to have engaged in any activities under either of those sections, plaintiff's complaint fails to state a SDWA claim against Gordon-Atlantic upon which relief can be granted.

Accordingly, the motion to dismiss the SDWA claims against both defendants is granted.[9]

## C. The CERCLA Claim

Plaintiff next brings a claim under 42 U.S.C. §§ 9601(25) and 9607(a)(4)(B) of CERCLA, asserting that it is entitled to cost

_____

[9]    Gordon-Atlantic also argues that the regulations at issue do not apply to property owners but to "water suppliers," and as plaintiff has not pled that Gordon-Atlantic is such a water supplier, it cannot be held liable for any alleged violations of those regulations. (*See* Gordon-Atlantic Memorandum of Law, at 22.) However, given the failure to state a claim against either defendant for the other reasons outlined above, the Court need not address this issue.

recovery for monies expended treating the affected water supply, as well as future costs associated with that operation. Defendants contend that plaintiff's CERCLA claim should be dismissed as time-barred because the statute dictates a limitations period of six years for cost recovery actions in connection with a remedial action, from the "initiation of physical on-site construction of the remedial action," *see* 42 U.S.C. § 9613(g)(2)(B), construction which defendants contend commenced, in the instant action, long before November 27, 2000 or December 14, 2001.[10]

"Congress enacted CERCLA to address the risks associated with the improper storage and disposal of hazardous and toxic substances." *Scheaffer v. Town of Victor*, 457 F.3d 188, 190 (2d Cir. 2006). Accordingly, the statute creates "a regime of broad-ranging liability, permitting the government to recover its remediation expenses directly from parties responsible for pollution and authorizing private parties to pursue contribution or indemnification from potentially responsible parties for expenses incurred responding to environmental threats." *Commander Oil Corp. v. Barlo Equip. Corp.*, 215 F.3d 321, 326 (2d Cir. 2000) (internal citations omitted). In varying provisions, CERCLA entitles parties "to recoup money spent to clean up and prevent future pollution at contaminated sites or to reimburse others for cleanup and prevention at contaminated sites . . . ." *Consol. Edison Co. of N.Y., Inc. v. UGI Utils., Inc.*, 423 F.3d 90, 94 (2d Cir. 2005). Specifically, section 107 of CERCLA authorizes the government and certain private

parties to bring cost recovery actions against potentially responsible parties. 42 U.S.C. § 9607(a). For these actions, CERCLA "distinguishes between two kinds of response: remedial actions – generally long-term or permanent containment or disposal programs – and removal efforts – typically short-term cleanup arrangements." *New York v. Shore Realty Corp.*, 759 F.2d 1032, 1040 (2d Cir. 1985) (footnotes omitted). The statute of limitations for the former is six years from the "initiation of physical on-site construction of the remedial action," while the statute of limitations for the latter is three years from the completion of the removal action. 42 U.S.C. § 9613(g)(2)(A-B).

The parties dispute the applicable statute of limitations – namely, defendants argue that it is six years, running from the "initiation of physical on-site construction of the remedial action," while plaintiff maintains that it is three years, running from the completion of the "removal action," which it submits has yet to occur. The parties do not dispute that Genesco conducted an IRM in August of 1998 to remove contaminants from the injection well on the Site and installed a soil-vapor extraction system to address residual soil contamination. Neither do the parties dispute that ten years before that, plaintiff installed an air stripping system at the Site to remove contaminants from the groundwater preceding its distribution to the public. Defendants argue that the initiation of these activities constituted "remedial action" because they were conducted to clean up hazardous substances, consistent with a permanent remedy and long-term in nature. Plaintiff argues that its installation of the air stripping system was not a permanent remedy, but rather a response to an

---

[10] Because one defendant, Genesco, signed a tolling agreement with plaintiff stating that the suit was deemed filed on November 27, 2006, and the other defendant, Gordon-Atlantic did not, the applicable dates of filing are, respectively, November 27, 2006 for the former and December 14, 2007, for the latter.

immediate health threat. After reviewing the pleadings and the briefs submitted by the parties, the Court finds that the fact-intensive inquiry necessary to adjudicate this claim precludes an order dismissing it at this stage in the proceedings, for reasons stated *infra*.[11]

CERCLA defines a "remedy" or "remedial action" as

> those actions consistent with permanent remedy taken instead of or in addition to removal actions in the event of a release or threatened release of a hazardous substance into the environment, to prevent or minimize the release of hazardous substances so that they do not migrate to cause substantial danger to present or future public health or welfare or the environment. The term includes, but is not limited to, such actions at the location of release as . . . neutralization, cleanup of released hazardous substances and associated contaminated materials, recycling or reuse, diversion, destruction, segregation of reactive wastes, dredging or excavations, repair or replacement of leaking containers, collection of leachate and runoff, onsite treatment or incineration, provision of alternative water supplies, and any monitoring reasonably required to assure that such actions protect the public health and welfare and the environment.

42 U.S.C. § 9601(24). "Removal," on the other hand, is defined as:

> the cleanup or removal of released hazardous substances from the environment, such actions as may be necessary taken in the event of the threat of release of hazardous substances into the environment, such actions as may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances, the disposal of removed material, or the taking of such other actions as may be necessary to prevent, minimize, or

---

[11]  As an initial matter, with respect to Genesco's 1998 clean-up activities, plaintiff argues that activities undertaken by Genesco may not trigger the statute of limitations on a CERCLA cost recovery claim because the action was brought to recoup costs incurred by *plaintiff*. The Court agrees. Because a party has no right to a CERCLA section 107 claim until it incurs clean-up costs, it follows that the initiation of that clean-up action, rather than the costs of a third-party, would trigger the statute of limitations for bringing such a claim. To rest the viability of one party's cost recovery claim on the actions of another party for which the first party has no claim to monies expended would defeat the purpose of the statute. *See, e.g., United States v. Atl. Research Corp.*, 127 S. Ct. 2331, 2338 (2007) (". . . § 107(a) permits cost recovery (as distinct from contribution) by a private party that has itself incurred cleanup costs"); *Schaefer*, 457 F.3d at 203 (ruling that statute of limitations was triggered with initiation of plaintiff's clean-up activities). Accordingly, the relevant inquiry for statute of limitations purposes relates not to Genesco's clean-up efforts, but rather plaintiff's clean-up efforts.

mitigate damage to the public health or welfare or to the environment, which may otherwise result from a release or threat of release.

42 U.S.C. § 9601(23). "Courts generally consider an action to constitute removal where it is a short-term cleanup arrangement in response to an environmental emergency and to constitute remedial action where it involves a longer-term, permanent containment or disposal program." *New York v. Hickey's Carting, Inc.*, 380 F. Supp. 2d 108, 119 (E.D.N.Y. 2007); *see also New York v. Shore Realty Corp.*, 759 F.2d, 1032, 1040 (2d Cir. 1985); *Prisco v. New York*, 902 F. Supp. 374, 385 (S.D.N.Y. 1995); *City of New York v. Exxon Corp.*, 633 F. Supp. 609, 614 (S.D.N.Y. 1986) ("In short, 'removal' actions are primarily those intended for the short-term abatement of toxic waste hazards, while 'remedial' actions are typically those intended to restore long-term environmental quality.").

The Court recognizes that the issue of whether plaintiff's[12] actions constitute "remedial" or "removal" actions is a question of law. *See OBG Technical Servs. v. Northrop Grumman Space & Mission Sys. Corp.*, 503 F. Supp. 2d 490, 524 (D. Conn. 2007); *see also Geraghty & Miller, Inc. v. Conoco Inc.*, 234 F.3d 917, 925-26 (5th Cir. 2000); *City of Moses Lake v. United States*, 458 F. Supp. 2d 1198, 1211 (E.D. Wash. 2006); *Cal. Dep't of Toxic Substances v. Alco Pac.*, 308 F. Supp. 2d 1124, 1135 n.10 (C.D. Cal. 2004); *Cytec Indus., Inc. v. B.F. Goodrich Co.*, 232 F. Supp. 2d 821, 832

(S.D. Ohio 2002); *Advanced Micro Devices, Inc. v. Nat'l Semiconductor Corp.*, 38 F. Supp. 2d 802, 810 (N.D. Cal. 1999). However, this inquiry often can hinge upon the resolution of certain factual questions, and a review of applicable case law on the subject revealed only one case where a Court made such a determination at the motion to dismiss stage. *See OBG*, 503 F. Supp. at 524 (because "both parties represented to the Court at oral argument that they would not introduce any new evidence or facts in connection with this claim beyond those that are set forth in the Second Amended Complaint, and they informed the Court that it could and should decide this issue based solely on OBG's pleadings[,]" the Court made the determination on a motion to dismiss). The Court notes that in the memoranda of law filed in this action as well as at oral argument, the parties disputed whether actions undertaken to address the contamination at the Site were consistent with a permanent remedy or merely a temporary "band-aid" response to an emergency situation. Specifically, defendants argue that, because the ROD issued by the EPA assumes as a part of the permanent remedy for the Site the continuation of water treatment activities, such as the installation of air stripping towers, undertaken by plaintiff in 1988, those activities constitute "remedial action" and hence their initiation started the clock for the six year statute of limitations. (*See* Gordon-Atlantic's Memorandum of Law, at 15; Genesco's Memorandum of Law, at 11.) Plaintiff responds that the air stripping towers at issue simply remove PCE from the aquifer water, but do nothing to remediate the source of groundwater contamination. Moreover, plaintiff argues it had no choice but to install the towers in order to meet its obligation to provide safe drinking water to

---

[12] As noted *supra*, the Court finds that Genesco's actions do not trigger the statute of limitations for a CERCLA cost recovery claim for reasons stated *supra*; therefore, only the characterization of plaintiff's actions are relevant for the instant inquiry.

its residents and, therefore, they were constructed as an emergency measure responsive to an immediate public health crisis, rather than as part of a long-term remedy to the contamination. (Plaintiff's Memorandum of Law, at 13-14.) Though both plaintiff and defendants cite to case law wherein courts interpreted activities addressing pollution as either "remedial" or "removal" actions, this Court notes that those conclusions were drawn at the summary judgment stage after the litigants had engaged in factual discovery. Given the factual disputes between the parties on this critical issue and the lack of related fact discovery, the Court concludes that the question of whether plaintiff's activities at the Site constituted a "remedial" or "removal" action, which is critical to the statute of limitations issue, is a question that cannot be resolved in this case at the motion to dismiss stage. Therefore, defendants' motion to dismiss plaintiff's CERCLA claim on the grounds that the statute of limitations has run is denied. Of course, defendants reserve the right, if they choose, to move for summary judgment on this issue at the conclusion of discovery.

### D. State Law Claims

In addition to the federal claims enumerated above, plaintiff also brings a series of claims under New York State law. Specifically, plaintiff asserts that it is entitled to damages for defendants' actions under the theories of private nuisance, public nuisance, trespass, negligence, negligence *per se* and indemnification. Plaintiff also seeks an order directing defendants to abate the situation at the Site pursuant to its claims of private and public nuisance, trespass and negligence. Defendants argue that plaintiff's claims for private and public nuisance, trespass, negligence and negligence *per se* are time-barred under C.P.L.R. § 214-c and/or all state common law claims are barred in whole under the theory of laches. Defendants further assert that plaintiff's indemnification claim is

time-barred and its negligence *per se* claim fails to state a cause of action. Finally, defendants argue that any injunctive relief sought by plaintiff runs afoul of the doctrine of primary jurisdiction, thus warranting a stay or dismissal of all such claims. The Court considers each argument below.

### 1. C.P.L.R. § 214-c

Plaintiff asserts that defendants' alleged discharge of PCE into the Site and subsequent failure to remediate the resultant contamination interferes with its enjoyment of its property, as well as the public's enjoyment of safe drinking water, and, therefore, makes defendants liable for private and public nuisance, as well as trespass. Plaintiff further alleges that defendants breached a duty to exercise reasonable care in the maintenance and ownership of the Site wells and, thus, are liable to plaintiff under a theory of negligence.[13] Finally, plaintiff submits that defendants' relevant actions or lack thereof constitute negligence *per se*, as they violate relevant provisions of state regulations governing such claims.

Defendants argue that plaintiff's New York State common law claims of public and private nuisance, trespass, negligence and negligence *per se* are barred because plaintiff seeks damages and because plaintiff has known or should have known about the contamination for more than three years prior

---

[13] Defendants do not dispute that plaintiff has pled facts adequate to establish the common law claims of private and public nuisance, trespass and negligence. Defendants do argue that plaintiff's negligence *per se* claim fails to state a claim for which relief may be granted. The Court agrees. Though plaintiff's negligence *per se* claim fails to survive the statutory bar of C.P.L.R. § 214-c, the Court also concludes that it fails to state a claim, as discussed *infra*.

to the commencement of the instant action, the applicable statute of limitations as set by C.P.L.R. § 214-c. That provision states, in relevant part, that:

> [n]otwithstanding the provisions of section 214, the three year period within which an action to recover damages for personal injury or injury to property caused by the latent effects of exposure to any substance or combination of substances, in any form, upon or within the body or upon or within property must be commenced shall be computed from the date of discovery of the injury by the plaintiff or from the date when through the exercise of reasonable diligence such injury should have been discovered by the plaintiff, whichever is earlier.

C.P.L.R. § 214-c(2). The New York Court of Appeals has determined that this discovery rule applies only to actions for damages. *See Jensen v. Gen. Elec. Co.*, 82 N.Y.2d 77, 89-90 (N.Y. 1993). Plaintiff submits that C.P.L.R. § 214-c(2) is inapplicable, as it addresses injuries to property, and as the aquifer water is not the property of the Village but of the State, its state law claims are ones "for which no limitation is specifically prescribed by law," and, thus, the six-year statute of limitations under C.P.L.R. § 213(1) applies. The Court finds this argument unavailing, noting that in its complaint, plaintiff claims that defendants' alleged acts "interfere[] with the Village's use and enjoyment of its property," (*see* Compl. ¶¶ 104-106; *see also id.* at ¶¶ 125-26, 130), and in its memorandum of law, plaintiff specifically asserts that it seeks "damages for injury to its water supply." (Plaintiff's Memorandum of Law, at 20.) If plaintiff pleads that an injury to property gives rise to its claims for relief, then it must accept the statute of limitations which governs such actions. Moreover, courts within the Second Circuit have heard factually similar claims from governmental entities seeking to recover costs related to the clean-up of groundwater supplies and ruled that the three year statute of limitations as mandated by C.P.L.R. § 214-c(2) applies, and this Court agrees with their analysis. *See State of New York v. Next Millennium Realty, LLC*, No. 03 Civ. 5985, 2007 WL 2362144, at *14-*15, n.11 (E.D.N.Y. Aug. 14, 2007) (court ruled that C.P.L.R. § 214-c(2) applied to action for damages under public nuisance claim based on the dumping of hazardous substances, rejecting plaintiff's argument that it was not seeking damages for an injury to property but rather seeking to preserve a public right); *see also New York v. Moulds Holding Corp.*, 196 F. Supp. 2d 210, 220 (N.D.N.Y. 2002) (same). Though the State of New York acted as the plaintiff in both of those actions and here the plaintiff is a municipality, both plaintiffs argued that the injuries giving rise to the causes of action were not injuries to property for purposes of the applicable statute of limitations. Both courts rejected that argument and this Court finds their reasoning persuasive. Accordingly, insofar as plaintiff seeks damages under the state law claims of public and private nuisance, trespass, negligence and negligence *per se*, the applicable statute of limitations governing those claims is set forth in C.P.L.R. § 214-c(2).

Plaintiff argues that even if the injury alleged is one to property, C.P.L.R. § 214-c(2) remains inapplicable under the tort theory of "continuing wrong," arguing that the PCE contamination "continues to inundate the Village's wells and is causing an ongoing harm," thus restarting the clock of the statute of limitations on a daily basis. (Plaintiff's Memorandum of Law, at 18.) In

support of this argument, plaintiff cites to *Sporn v. MCA Records, Inc.*, 462 N.Y.S.2d 413 (N.Y. 1983), a decision involving a copyright conversion claim that is wholly inapposite to the case at bar. Indeed, the controlling case on this issue, as New York State and Second Circuit jurisprudence has recognized time and again, is the *Jensen* case, wherein the Court of Appeals definitively determined that "[t]he phrase 'injury to property' in the date of discovery Statute of Limitations, CPLR 214-c(2), embraces actions for damages ensuing from exposure to any substance, including those characterized as continuing trespass and nuisance." 82 N.Y.2d at 81 (further noting that injunctive relief remains available to litigants in such actions under a continuing tort theory); *see also Syms v. Olin Corp.*, 408 F.3d 95, 109 (2d Cir. 2005) (stating that "New York law no longer recognizes the existence of the continuing tort doctrine in latent exposure cases seeking money damages."); *Williams v. Dow Chem. Co.*, No. 01 Civ. 4307, 2004 U.S. Dist. LEXIS 10940, at *10 (S.D.N.Y. 2004) (same); *Commander Oil Corp. v. Barlo Equip. Corp.*, No. 90 Civ. 1243, 1997 U.S. Dist. LEXIS 23920, at *44-*45 (E.D.N.Y. 1997), *rev'd in part on other grounds by* 215 F.3d 321 (2000); *Town of New Windsor v. Tesa Tuck, Inc.*, 919 F. Supp. 662, 674-75 (S.D.N.Y. 1996). Accordingly, despite plaintiff's characterization of its injury to property as a "continuing wrong," the three year statute of limitations as prescribed by C.P.L.R. § 214-c(2) applies.

Plaintiff next argues that, because C.P.L.R. § 214-c(2) addresses injuries "caused by the latent effects of exposure" and the injury to its water supply was patent, the statute does not apply. Specifically, plaintiff notes that there was no interval between the water's exposure to the PCE and its resultant contamination and, therefore, its claims do not fall under the purview of C.P.L.R. § 214-c(2), which applies "where there is an interval between the alleged exposure and the resulting harm." (Plaintiff's

Memorandum of Law, at 19.) Plaintiff pled in its complaint that the exposure occurred between 1965 and 1969, but was not discovered until 1986 at the absolute earliest. (Compl. ¶¶ 13, 15, 17-18, 23-24.) Plaintiff's argument that "injury" occurs in exposure cases at the moment of exposure, rather than its discovery by the injured party, would completely obviate the need for C.P.L.R. § 214-c(2)'s discovery rule, as the three year statute of limitations applicable to injury to property would simply run from the moment of exposure regardless of when it was discovered. *See Jensen*, 82 N.Y.2d at 85 (noting that "[p]rior to the enactment of CPLR 214-c(2), the Statute of Limitations began to run as of the date of exposure, regardless of the date on which the injury was discovered.") (citations omitted). The Court rejects that argument.[14] Thus, in keeping with New York State jurisprudence and the Second Circuit application of state law, this Court finds that the "injury to

---

[14] Moreover, the Court finds plaintiff's reliance on *Germantown Cent. Sch. Dist. v. Clark*, 100 N.Y.2d 202, 206 (N.Y. 2003) in support of its argument to be misplaced. In that case, plaintiffs sought redress for an incomplete asbestos abatement, arguing that the date of the discovery of the botched removal some thirteen years after its completion triggered the statute of limitations under C.P.L.R. § 214-c(2)'s "discovery rule." *Id.* at 204-05. The Court of Appeals disagreed, noting that plaintiff had not pled that the ineffective abatement caused any new injuries aside from those caused by its original installation into the building; accordingly, the injury suffered was one for professional malpractice rather than latent exposure to a hazardous substance and, therefore, C.P.L.R. § 214-c(2) was inapplicable. *Id.* at 206-07. Plaintiff's action, conversely, is a "contamination case[] where the property damage results from the seepage or infiltration of a toxic foreign substance over time," *id.* at 207, specifically, the migration of the PCE into the Supply Wells.

property" pursuant to which plaintiff brings claim occurred at the moment that plaintiff discovered the PCE contamination in the Village groundwater. *See, e.g., Jensen*, 82 N.Y.2d at 89 (exposure and resultant harm occurred from 1958 to 1969 but injury occurred in 1986, upon plaintiff's discovery of exposure); *Weiner v. Lenox Hill Hosp.*, 88 N.Y.2d 784, 788-89 (N.Y. 1996) (exposure and resultant harm occurred in 1985 but injury occurred in 1991, upon plaintiff's discovery of exposure); *Scheg v. Agway, Inc.*, 645 N.Y.S.2d 687, 688 (N.Y. App. Div. 1996) (where arsenic migrated from hazardous waste site onto plaintiff's property, injury occurred when plaintiff learned of its presence); *see also Bano v. Union Carbide Corp.*, 361 F.3d 696, 709 (2d Cir. 2004) (noting that "a claim accrues when the plaintiff first discovers the property damage; the fact that the defendant's conduct may be characterized as a continuing trespass or nuisance does not delay the commencement of the limitations period.") (citations omitted); *Next Millennium Realty, LLC*, 2007 WL 2362144, at *15 (date of discovery of contamination was date of injury); *Town of Oyster Bay v. Occidental Chem. Corp.*, 987 F. Supp. 182, 209 (E.D.N.Y. 1997) ("As discovery of the harm triggers the running of the statute of limitations under New York law, the Court looks to when the Town can be said to have discovered the harm.").

Finally, plaintiff argues that the application of C.P.L.R. § 214-c(2) is limited to actions seeking damages as their primary objective and so is inapplicable because plaintiff's "primary objective in bringing its claims is for equitable relief rather than damages." (Plaintiff's Memorandum of Law, at 20.) Thus, plaintiff attempts to distinguish their situation from an New York Appellate Division decision that found that C.P.L.R. § 214-c(2) applied to a plaintiff's action, which included a request for injunctive relief, because "the gravamen of the action [wa]s one for compensation; the multimillion dollar damage claims are not

merely incidental to the equitable relief sought." *Thoma v. Town of Schodack*, 776 N.Y.S.2d 109, 111 (N.Y. App. Div. 2004). However, in the instant case, plaintiff seeks an amount in excess of $2,500,000 for the each of the respective claims of private nuisance, public nuisance, trespass, negligence and negligence *per se*, (*see* Compl. ¶¶ 111, 120, 131, 142, 161), in addition to injunctive relief. As in *Thoma*, this Court concludes in the instant case that the claims for multi-million dollar damages cannot be described as "incidental" to any other form of desired relief. *See Russo v. Keyspan Corp.*, No. 15757/2007, 2008 N.Y. Slip Op. 50121U, at *3 (N.Y. Sup. Ct. Jan. 22, 2008) (applying C.P.L.R. § 214-c and dismissing civil action seeking damages and injunctive relief based upon alleged exposure to contaminants from underground plumes); *see generally Palmieri v. Village of Babylon*, 809 N.Y.S.2d 566 (N.Y. App. Div. 2006) (citing *Thoma* and holding that "[s]ince the claims for damages set forth in the amended complaint were more than merely incidental to the equitable relief sought in the original complaint, the plaintiff was required to file a timely notice of claim pursuant to General Municipal Law § 50-e"). Accordingly, plaintiff's claims of private nuisance, public nuisance, trespass, negligence and negligence *per se* are subject to the three-year statute of limitations as set forth in C.P.L.R. § 214-c(2).[15]

---

[15] Plaintiff also argues that C.P.L.R. § 214-c(2) is inapplicable because "the movement of PCE into the Village's drinking water does not fit within the definition of 'exposure: direct or indirect exposure by absorption, contact, ingestion, inhalation, implantation or injection.' C.P.L.R. § 214-c(1)." (Plaintiff's Memorandum of Law, at 20.) Specifically, plaintiff argues that the PCE "dissolved" into the aquifer and was not "absorbed." The Court notes that plaintiff has pled that defendants did not "prevent[] the

In the complaint, plaintiff has alleged that (1) the alleged contamination at issue took place between 1965 and 1969; (2) Nassau County discovered the contamination in 1986; (3) the NYSDEC placed the Site on the Registry of Inactive Hazardous Waste Disposal Sites in New York State and entered into an Administrative Order with Genesco directing that it conduct an RI/FS in 1993; and (4) the EPA placed the Site on the NPL in 1998. (Compl. ¶¶ 13, 15, 17-18, 23-24, 30-34.) Based on the facts as pled, the Court finds that the injury to property giving rise to plaintiff's state common law claims for public and private nuisance, trespass and negligence occurred *at the absolute latest* in 1998, at which point plaintiff either knew or well should have known about the contamination at issue. *See, e.g., Town of Oyster Bay v. Occidental Chem. Corp.*, 987 F. Supp. 182, 209 (E.D.N.Y. 1997) (action for damages related to pollution of property was time-barred by C.P.L.R. § 214-c(2) where contaminated site was placed on National Priorities List in 1983, an Administrative Order directing an RI/FS was signed in 1986 and a remedial plan was selected in 1990, but town did not file suit until 1994). Therefore, the three-year statute of limitations as prescribed by C.P.L.R. § 214-c(2) began to run in 1998 at the latest, making plaintiff's above-referenced state law claims for damages/injunctive relief, brought in November of 2006 and December of 2007, untimely. Accordingly, defendants' motion to dismiss plaintiff's state common law claims for private nuisance, public nuisance,

trespass, negligence and negligence *per se* is granted.[16]

## 2. Negligence *Per Se*

Even assuming *arguendo* that the negligence *per se* claim were not barred by C.P.L.R. § 214-c(2), it also fails to survive a motion to dismiss because such a claim cannot be based solely upon an administrative regulation.

Plaintiff alleges that, in permitting PCE to enter the groundwater and failing to address the resultant contamination, defendants have breached a duty owed under 6 N.Y. Comp. Codes, Rules & Regs. ("N.Y.C.R.R.") Part 703.5 and 10 N.Y.C.C.R. Part 5-1.52, which set the groundwater standards for PCE applicable to the Village's water supply at the level of 5 ppb by the NYSDEC and the NYSDOH, respectively.[17] Defendants argue that plaintiff's claim fails as a matter of law because: (1) under New York law, a violation of an administrative regulation (as opposed to a specific statutory requirement) cannot support a negligence *per se* claim; and (2) any alleged actions giving rise to such claims

---

unlawful *injection* of contaminants into the well," (Compl. ¶¶ 16-17) (emphasis added) and that this failure permitted "the movement of fluid containing any contaminant into an underground source of drinking water." (*Id*. at ¶¶ 17-18.) As C.P.L.R. § 214-c(1) specifically defines "exposure" as, among other activities, "injection," plaintiff cannot escape C.P.L.R. § 214-c(2)'s statutory bar on this ground.

[16] Defendants further moved to dismiss or stay the entirety of plaintiff's claims that seek injunctive relief under the doctrine of primary jurisdiction on the grounds that both federal and state agencies are fully engaged in addressing the contamination at the Site. However, all claims that seek injunctive relief fail for reasons stated *supra*. Therefore, defendants' primary jurisdiction argument is rendered moot.

[17] Plaintiffs also brought claim that defendants violated a duty owed pursuant to 40 C.F.R. § 144.12(a) and 40 C.F.R. § 146.10(c); however, the Court addressed defendants' claimed liability under those regulations in Section III(B) and concluded that such claims do not survive the instant motion, for reasons stated *supra*.

precede the passage of the relevant regulations, which were not intended to have retroactive effect. Gordon-Atlantic further asserts that this claim fails because plaintiff has not identified the specific duty owed in relation to the relevant regulations or that any action or inaction on its part was the proximate cause of plaintiff's injury.

The Court notes, as a threshold matter, that though plaintiff's opposition papers failed to address defendants' motion to dismiss plaintiff's negligence *per se* claim, the claim shall not be deemed abandoned because "[s]uch motions assume the truth of a pleading's factual allegations and test only its legal sufficiency. Thus, although a party is of course to be given a reasonable opportunity to respond to an opponent's motion, the sufficiency of a complaint is a matter of law that the court is capable of determining based on its own reading of the pleading and knowledge of the law. If a complaint is sufficient to state a claim on which relief can be granted, the plaintiff's failure to respond to a Rule 12(b)(6) motion does not warrant dismissal." *McCall v. Pataki*, 232 F.3d 321, 322-23 (2d Cir. 2000) (internal citations omitted); *see also Maggette v. Dalsheim*, 709 F.2d 800, 802 (2d Cir. 1983). However, the Court finds that this claim fails to survive defendants' motion to dismiss for the reasons set forth below.

"In New York, the 'unexcused omission' or violation of a duty imposed by statute for the benefit of a particular class 'is negligence itself[.]'" *Chen v. U.S.*, 854 F.2d 622, 627 (2d Cir. 1988) (quoting *Martin v. Herzog*, 228 N.Y. 164, 168 (N.Y. 1920)); *see Doe v. United States*, 520 F. Supp. 1200, 1202 (S.D.N.Y. 1981); *Willy v. Mulledy*, 78 N.Y. 310, 314 (N.Y. 1878). However, defendants argue that New York State law bars claims of negligence *per se* which arise from the violation of an administrative regulation, rather than a statute. Indeed, "it is long and firmly established in New York that the violation of a rule of an administrative agency is merely some evidence of negligence but does not establish negligence as a matter of law because a regulation lack[s] the force and effect of a statute." *Chen*, 854 F.2d at 627 (citing *Long v. Forest-Fehlhaber*, 55 N.Y.2d 154, 160 (N.Y. 1982) and *Teller v. Prospect Hgts. Hosp.*, 280 N.Y. 456, 460 (N.Y. 1939) (internal quotations omitted)); *see also Dorking Genetics v. United States*, 76 F.3d 1261, 1266, n.2 (2d Cir. 1996); *Zimmer v. Chemung Cty. Perf. Arts, Inc.*, 65 N.Y.2d 513, 522 (N.Y. 1985); *Conte v. Large Scale Dev. Corp.*, 10 N.Y.2d 20, 29 (N.Y. 1961). Here, plaintiff has pled that "defendants' violations of, and failure to remedy the violations of NYSDEC or NYSDOH's standard for PCE . . . constitute negligence *per se*." (Compl. ¶ 160.) Because New York law is clear that the violation of an administrative regulation alone cannot support a claim of negligence *per se*, plaintiff's claim for such cannot survive defendants' motion to dismiss even if it were not time-barred.[18]

### 3. Indemnification

Plaintiff also asserts claim that defendants' contamination of the Site and failure to properly rectify the resultant pollution of the Village's groundwater caused it to bear costs and damages which defendants should have borne. Accordingly, plaintiff submits that defendants must indemnify it for all damages, costs and expenses that it has thus far incurred and that which it will incur in the future. New York law states that "[i]t is nothing short of simple fairness to recognize that '[a] person who, in

---

[18] The Court need not consider the remaining arguments submitted by defendants in support of their motion on this claim.

whole or in part, has discharged a duty which is owed by him but which as between himself and another should have been discharged by the other, is entitled to indemnity.'" *McDermott v. New York*, 50 N.Y.2d 211, 217 (N.Y. 1980) (citation omitted) (alteration in original). Accordingly, "'[where] payment by one person is compelled, which another should have made a contract to reimburse or indemnify is implied by law.' This implied in law contract covers, 'not mere liability,' but loss or damage." *Id*. (internal citations omitted) (alteration in original). Defendants do not contest that plaintiff has adequately pled that it is entitled to indemnification for past and future damages related to the clean-up of the Site. Defendants argue, and plaintiff concedes, that this claim is governed by the six year statute of limitations as directed by C.P.L.R. § 213(2) and, therefore, any claims for damages under a theory of indemnification which precede November 27, 2000 and December 14, 2001, as against Genesco and Gordon-Atlantic, respectively, are time-barred. Defendants conceded in their written submissions to the Court, as well as at oral argument, that plaintiff has properly pled a plausible claim for indemnification for all costs it has incurred since those respective dates and all costs it will incur going forward. Therefore, defendants' motion to dismiss plaintiff's claim for indemnification as it relates to costs incurred since November 27, 2000 and December 14, 2001 for Genesco and Gordon-Atlantic, respectively, and all future costs related to the clean-up of the Site is denied. Plaintiff's indemnification claim for costs incurred prior to those dates is hereby dismissed as time-barred.

### 4. Laches

Defendants argue that because plaintiff has been aware of contamination in its supply wells since 1994 at the latest, (*see* Gordon-Atlantic's Memorandum of Law, at 19), and yet did not bring this action until 2007, its inexcusable delay in doing so entitles defendants to an order dismissing plaintiff's state common law claims for public and private nuisance, trespass, negligence, negligence *per se* and indemnification based on laches.[19]

New York courts have "defined laches as an equitable bar, based on a lengthy neglect or omission to assert a right and the resulting prejudice to an adverse party. The mere lapse of time, without a showing of prejudice, will not sustain a defense of laches." *Saratoga County Chamber of Commerce, Inc. v. Pataki*, 100 N.Y.2d 801, 816 (N.Y. 2003) (citations omitted). "In order to invoke the doctrine of laches, 'a party must show: (1) conduct by an offending party giving rise to the situation complained of, (2) delay by the complainant in asserting his or her claim for relief despite the opportunity to do so, (3) lack of knowledge or notice on the part of the offending party that the complainant would assert his or her claim for relief, and (4) injury or prejudice to the offending party in the event that relief is accorded the complainant.'" *Matter of Kuhn v. Town of Johnstown*, 669 N.Y.S.2d 757, 759 (N.Y. 1998) (quoting *Cohen v. Krantz*, 643 N.Y.S.2d 612, 614 (N.Y. 1996) (internal citations omitted)).

Plaintiff argues, as a threshold matter, that laches cannot preclude actions by governmental entities. Indeed, New York law is clear that the defense of laches "may not be interposed as a defense against the State when acting in a governmental capacity to enforce a public right or protect a public interest." *Cortlandt Nursing Home v. Axelrod*, 66 N.Y.2d 169, 177, n.2 (N.Y.

---

[19] As the Court has dismissed the entirety of plaintiff's state law common law claims save that of indemnification for reasons stated *supra*, it will consider defendant's "doctrine of laches" defense as applicable only to that remaining claim.

1985); *Flacke v. NL Indus.*, 644 N.Y.S.2d 404, 406 (N.Y. App. Div. 1996) (defense of laches precluded in action where plaintiff sued defendant polluter because "plaintiff was clearly acting in its governmental capacity as gatekeeper of the environment"); *see also Fowler v. City of Saratoga Springs*, 626 N.Y.S.2d 306, 307 (N.Y. App. Div. 1995) ("laches can be imputed only to a municipality acting in its private or proprietary capacity and not when it is protecting a public interest") (internal citations omitted). "However, a municipality may be estopped from asserting that a claim was untimely filed when its improper conduct induced reliance by a party who changed his or her position to his or her detriment or prejudice." *Conquest Cleaning Corp. v. New York City Sch. Constr. Auth.*, 719 N.Y.S.2d 689, 689 (N.Y. App. Div. 2001) (citing *Bender v. New York City Health & Hospitals Corp.*, 38 N.Y.2d 662 (N.Y. 1976)). Accepting the facts as pled and drawing all reasonable inferences therefrom, the Court concludes that plaintiff is acting in its governmental capacity as a gatekeeper of the environment. Plaintiff seeks damages for monies spent making the Village groundwater safe for public consumption. Further, plaintiff does not allege, nor have defendants argued, that defendants changed their position to their detriment in reliance on any improper conduct by plaintiff.[20] Accordingly, the defense of laches does not support dismissal at this stage in the proceedings and defendants' motion to dismiss plaintiff's indemnification claim on those grounds is denied.

## IV. CONCLUSION

For the reasons stated above, defendants' motions to dismiss are GRANTED as to the following: (1) plaintiff's RCRA claim against both defendants; (2) plaintiff's SDWA claim against both defendants; (3) plaintiff's private nuisance, public nuisance, trespass, negligence and negligence *per se* claims against both defendants; and (4) plaintiff's indemnification claim against both defendants insofar as it seeks relief for costs incurred prior to November 27, 2000 from Genesco and December 14, 2001 from Gordon-Atlantic. Defendants' motions to dismiss are DENIED as to the following: (1) plaintiff's CERCLA cost recovery claim against both defendants; and (2) plaintiff's indemnification claim against both defendants insofar as it seeks relief for costs incurred after November 27, 2000 from Genesco and December 14, 2001 from Gordon-Atlantic.[21] The parties shall proceed with discovery forthwith in accord with the individual rules of Magistrate Judge E. Thomas Boyle.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated:     January 27, 2009
           Central Islip, New York

---

[20] In addition, any determination of prejudice suffered by defendants as a result of plaintiff's alleged delay in filing suit is necessarily a fact-based inquiry inappropriate for judgment on a motion to dismiss and better resolved at the summary judgment stage when the parties have had the opportunity to engage in factual discovery.

[21] As noted *supra*, defendants also sought to dismiss, or at a minimum, stay any claims for injunctive relief under the doctrine of primary jurisdiction on the grounds the Court should not interfere with the ongoing activities of the state and federal agencies in connection with efforts to remediate the Site. However, because the only remaining claims are for monetary damages (and not injunctive relief), the Court need not address this issue.

Attorney for plaintiff is Daniel Riesel, Sive, Paget & Riesel, P.C., 460 Park Avenue, New York, NY, 10022. Attorneys for defendant Genesco, Inc. are Delight D. Balducci, Periconi, LLC, 708 Third Avenue, 17th Floor, New York, NY, 10017, and Melissa Ballengee Alexander and Paul A. Alexis, Boult, Cummings, Conners & Berry P.L.C., 1600 Division Street, Suite 700, P.O. Box 340025, Nashville, TN, 37203. Attorneys for defendant Gordon-Atlantic Corp. are Christopher Joseph McKenzie, Michael G. Murphy and Stephanie Marie Haggerty, Beveridge & Diamond, P.C., 477 Madison Avenue, 15th Floor, New York, NY, 10022.